# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

|  |  |
|---|---|
| MAO SAN,<br><br>    Petitioner,<br><br>    v.<br><br>JAIME RIOS, et al.,<br><br>    Respondents. | No. 5:26-cv-02227-BFM<br><br>**ORDER ON PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Mao San filed this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 on April 29, 2026. (ECF 1.) For the reasons stated below, the Petition is **granted** in part and Petitioner is ordered released.

## FACTUAL BACKGROUND

Petitioner Mao San is a noncitizen who is currently detained in the Adelanto Detention Facility, within the Central District of California. (ECF 1 ("Pet.") ¶ 16.) He fled Cambodia when he was ten years old. (Pet. ¶ 22.) After living in refugee camps for seven years, he entered the United States in May 1985 and became a lawful permanent resident in 1986 or 1987. (Pet. ¶ 22.)

After sustaining criminal convictions, Petitioner was ordered removed to Cambodia in 1995. (Pet. ¶ 24.) He was detained by INS for approximately three

years before being released on an administrative order of supervision, or OSUP, in 1999. (Pet. ¶ 25.) Petitioner alleges that he complied with the terms of his supervised release for nearly three decades and appeared regularly for required check-ins. (Pet. ¶ 26.) A new supervision order imposed additional requirements in October 2025, but Petitioner alleges he has complied with those conditions too. (Pet. ¶ 27.)

On April 22, 2026, Petitioner was arrested by ICE officers. (Pet. ¶ 28.) The officers stated they had a warrant to take him into immigration custody. (Pet. ¶ 28; *see also* ECF 9-4 at 2 (copy of warrant).) When he arrived at the short-term detention facility in Downtown Los Angeles, Petitioner was informed that he was being redetained because of a 2016 arrest. (Pet. ¶ 29.) Petitioner has been in immigration detention since April 22, 2026.

Petitioner filed this Petition on April 29, 2026. He alleged that his redetention was not authorized, in that he did not violate the terms of his supervision and Respondents did not make a showing of changed circumstances that would justify his detention. (Pet. ¶¶ 84-91, 99-103.)[1] With regard to changed circumstances, Petitioner asserted that he has never spoken with the Cambodian consulate and that, historically, Cambodia has required interviews before agreeing to issue travel documents. (Pet. ¶ 31.) Petitioner also noted that Respondents had not taken any steps consistent with removing him to a third

---

[1] In the Notice of Revocation, DHS offered Petitioner's 2016 arrest as one of two bases for revocation of Petitioner's OSUP. (ECF 9-5 at 5-6.) Petitioner alleged in his Petition that he was arrested but was released the same day, and that charges were never brought because there was insufficient evidence of wrongdoing. He also notes that the arrest was a decade stale by the time DHS raised the point and that he had appeared at nearly a dozen check-ins between the 2016 arrest and his detention by immigration authorities. (Pet. ¶¶ 2, 24.) Respondents' Answer does not rely on this arrest as justifying Petitioner's current detention (*see generally* ECF 9), and as such, the Court does not discuss it further.

country. (Pet. ¶ 32.) Petitioner argues that, because his detention was not substantively justified, he should be released from custody.

In the alternative, Petitioner argued that Respondents did not follow DHS's own regulations concerning redetention. (Pet. ¶¶ 65-80.) Petitioner alleges he was given only pro forma notice of why his supervision was being revoked (Pet. ¶ 55) and did not receive an opportunity to contest the reasons for the revocation (Pet. ¶ 56; *but see* ECF 9-5 at 7 (Respondents' exhibit showing that that Petitioner was offered the opportunity for an informal interview and declined).) Petitioner argued that the appropriate remedy for these violations is his immediate release under the conditions of supervision previously imposed. (Pet. at 27.)

Finally, Petitioner argued that the Court should enter orders limiting Respondents' ability to remove him to a third country. (Pet. ¶¶ 50-52.)

Respondents filed their Answer on May 6, 2026. Respondents claim that DHS's recent success in repatriating Cambodian citizens is a changed circumstance that justifies Petitioner's detention. (ECF 9 ("Answer") at 3.) Respondents also argue that they followed the required procedures before taking Petitioner into custody. (Answer at 3.) Finally, Respondents claim that Petitioner has not cooperated in his removal, and that his detention is justified for that reason as well. (Answer at 4.)

Petitioner filed a Traverse supporting the claims in his Petition. (ECF 10 ("Traverse").) The matter is now fully briefed and ready for decision.

## ANALYSIS

Petitioner argues that his redetention was unlawful for both substantive and procedural reasons, invoking regulations, statutes, and the Constitution. The Court concludes that Respondents have not justified Petitioner's redetention under 8 U.S.C. § 1231 and 8 C.F.R. § 241.13, and that the proper

remedy for the violation is release. As such, while the Court has some doubts about whether Respondents complied with the appropriate procedures, it declines to rule on that question, or the substantive due process question, and instead rules on the narrowest grounds presented by the Petition.

## A.    Legal Framework

Section 1231 governs the Government's authority to detain non-citizens with final orders of removal. The statute provides that the Government "shall detain" noncitizens during the "removal period." 8 U.S.C. § 1231(a)(2)(A). The removal period is 90 days. *Id.* § 1231(a)(1)(A). Thereafter, the statute permits—but does not require—the detention of certain noncitizens found inadmissible or removable on specified grounds, "or who [have] been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal." *Id.* at § 1231(a)(6). Such individuals "may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)." *Id.*

While the language of § 1231(a) places no temporal limitation on such detention, the Supreme Court has cautioned that the "indefinite" detention of noncitizens would pose serious constitutional concerns. *Zadvydas v. Davis*, 533 U.S. 678, 690-96 (2001). It has therefore interpreted Section 1231(a)(6) to permit detention for purposes of effectuating removal only where such removal is "reasonably foreseeable." *Id.* at 699. The Court found it "practically necessary to recognize some presumptively reasonable period of detention," which it set at six months. *Id.* at 701. After the 6-month period, "once the [noncitizen] provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* Because the statute only authorizes a "reasonable" period of detention to effectuate removal, "as the period of prior

4

postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.*

The government has adopted regulations to implement its authority to detain or release noncitizens under Section 1231(a), as construed by *Zadvydas*. *See* 8 C.F.R. §§ 241.4, 241.13. Sections 241.13(g)(1) and 241.13(h) provide that the Government "shall" release a noncitizen on an "order of supervision" if it determines that their removal is not reasonably foreseeable, unless "there are special circumstances justifying continued detention."

The regulations also provide procedures for the government to revoke an order of supervision and redetain a noncitizen, when warranted. DHS may revoke the noncitizen's OSUP if he violates a condition of release, 8 C.F.R. § 241.13(i)(1), or "if, on account of changed circumstances, [DHS] determines that there is a significant likelihood that the [noncitizen] may be removed in the reasonably foreseeable future," 8 C.F.R. § 241.13(i)(2). Thus, in the absence of a violation, the regulation "requir[es] (1) an individualized determination (2) by ICE that, (3) based on changed circumstances, (4) removal has become significantly likely in the reasonably foreseeable future." *Nguyen v. Hyde*, 788 F. Supp. 3d 144, 150 (D. Mass. 2025) (quoting *Kong v. United States*, 62 F.4th 608, 619-20 (1st Cir. 2023)).

Consistent with the weight of authority in this District, the Court finds that the government bears the burden of justifying the revocation of an order of supervision. *See Trieu v. Mullin*, 5:26-cv-01653-MBK, 2026 WL 1045194, at *5 (C.D. Cal. Apr. 17, 2026) (collecting cases). That is, "'[t]he burden-shifting framework from *Zadvydas* does not apply' where the petitioner has already been 'issued a final order of removal, detained, and subsequently released on an' OSUP." *Espada v. Doe*, No. 5:25-cv-02983-JWH-KES, 2026 WL 181539, at *5 (C.D. Cal. Jan. 20, 2026) (quoting *Yan-Ling X. v. Lyons*, 813 F. Supp. 3d 1157, 1163 (E.D. Cal. 2025)), *report and recommendation adopted*, 2026 WL 192150

5

(C.D. Cal. Jan. 23, 2026). Instead, "when ICE revokes release to effectual removal, it is *ICE's burden* to show a significant likelihood that the [noncitizen] may be removed." *Id.* (cleaned up).

**B.    Discussion**

**1.    Respondents Have Not Complied with 8 C.F.R. § 241.13 and 8 U.S.C. § 1231**

Respondents have not shown that they revoked Petitioner's OSUP after an individualized finding that, based on changed circumstances, his removal had become significantly likely in the reasonably foreseeable future.

The relevant facts are as follows: DHS was unable to secure travel documents for Petitioner during a three-year period in custody ending in 1999 and therefore released him. (Pet. ¶ 2.) As explained above, Petitioner's release was necessarily premised on DHS's finding that his removal was not reasonably foreseeable at that time. *See* 8 C.F.R. § 241.13(g)(1). Petitioner was redetained last month, and there is little indication DHS made progress toward obtaining travel documents for Petitioner at any time between Petitioner's release on supervision and his redetention. (Pet. ¶ 3; Traverse at 3.) Deportation Officer Jesslyn Mendoza said that on May 1, 2026—i.e., *after* Petitioner filed this Petition—an ERO officer interviewed Petitioner. (ECF 9-1 ("Mendoza Decl.") ¶ 17.) But nothing in DO Mendoza's declaration suggests that Respondents had any reason to think that Petitioner's travel document was imminent when they detained him, or that they had taken any concrete steps to make it so.

Instead, Respondents' asserted "changed circumstance" is that Cambodia is now more willing to issue travel documents to its citizens. (Answer at 3.) Specifically, DO Mendoza claims that the Cambodian consulate has been expediting travel document requests and that DHS has had some success obtaining travel documents within one to two months. (Mendoza Decl. ¶ 18.)

6

There are at least three problems with Respondents' reliance on this representation to meet their burden.

First, DO Mendoza's declaration "does little to establish the likelihood of Petitioner's removal in the absence of evidence about what steps Respondents have taken to deport him specifically." *Nguyen v. Scott*, No. 2:25-cv-1398, 2025 WL 2165995, at \*8 (W.D. Wash. July 30, 2025); *see also Phan v. Warden of Otay Mesa Det. Facility*, 813 F. Supp. 3d 1179, 1186 (S.D. Cal. 2025) ("[E]vidence that Respondents have successfully removed other Vietnamese citizens is insufficient to demonstrate a significant likelihood that Petitioner will receive a travel document."). Nor does it constitute a "changed circumstance" in Petitioner's case. *See Yang v. Kaiser,* No. 25-cv-2205-DAD-AC, 2025 WL 2791778, at \*6 (E.D. Cal. Aug. 20, 2025) ("Respondents' citation to an isolated reported instance of the Chinese government accepting deportees does not, by itself, demonstrate changed circumstances regarding petitioner in particular."); *Van Ngo v. Noem*, No. 25-CV-3234 JLS (MMP), 2025 WL 3470438, at \*4 (S.D. Cal. Dec. 3, 2025) ("[T]he fact that others have been removed to [the petitioner's country of origin] alone cannot constitute changed circumstances in an individual petitioner's case.").[2] The likelihood that a country will accept any particular deportee may depend on individualized factors—i.e., whether the noncitizen possesses identity documents, whether the country can find proof of identity, how long the individual has been in the United States, and whether the noncitizen has a criminal record. *See, e.g.*, *Martynenko v. Bondi*, No. 2:26-CV-00626-JHC, 2026 WL 787667, at \*3 (W.D. Wash. Mar. 20, 2026)

---

[2] *Luong v. Marin*, 5:26-cv-1496-SB-PD, 2026 WL 931132 (C.D. Cal. Apr. 3, 2026) cited by Respondents (ECF 9 at 3), is not to the contrary. There, Respondents pointed to a new MOU between the United States and Vietnam in which Vietnam agreed to accept deportees, *plus* empirical evidence of *similarly situated* noncitizens being removed to Vietnam. *Id.* at \*3. Respondents make no similar showing here.

7

(government representing that country required additional identity documents before it would process travel document); *Nguyen v. Scott*, 796 F. Supp. 3d 703, 723 (W.D. Wash. 2025) (indicating that issuance of travel document depended on whether country could locate individuals in Vietnam to confirm identity, criminal record, when the individual left Vietnam, etc.). As such, proof that *some* individuals have been removed to a particular country, without more, is insufficient.

Second, DO Mendoza's representation is vague. She does not state how many removals to Cambodia have been effectuated, and how many travel requests it took to get the number of approvals obtained. Without such details, DO Mendoza's declaration does not satisfy Respondents' burden of showing a changed circumstance or that Petitioner's removal is substantially likely to occur in the reasonably foreseeable future. Indeed, in recent months, courts have rejected similar representations about Cambodia as inadequate to show changed circumstances or reasonably foreseeable removal. *See Suong v. Bondi*, No. 2:25-CV-02309-LK, 2025 WL 3718644, at *4 (W.D. Wash. Dec. 23, 2025) (rejecting as inadequate DHS's representation that while there was "no definitive timeline" for travel documents from Cambodia, there was increased cooperation and 55 removals in 2025); *Im v. Semaia*, No. 5:25-cv-02733-JAK, 2025 WL 4474995, at *4 (C.D. Cal. Oct. 30, 2025) (rejecting as inadequate the assertion that DHS had been able to get travel documents within a month where it was unclear whether those individuals were similarly situated—i.e., whether prior attempts to obtain travel documents had been unsuccessful); *Thoth Sun v. Noem*, No. 3:25-cv-2433-CAB-MMP, 2025 WL 2800037, at *2 (S.D. Cal. Sept. 30, 2025) (rejecting assertion that changed circumstances supported redetention of petitioner and calling DHS's claim that they were putting together a travel document request and pursuing removal the equivalent of the promise that the "check is in the mail").

Third, DO Mendoza's declaration is undermined by data showing that removals to Cambodia are still exceedingly rare. In 2024, the most recent year for which ICE produced data, the United States removed 20 individuals to Cambodia. See ICE Annual Report 2024 at 98 (Dec. 19, 2024), https://www.ice.gov/doclib/eoy/iceAnnualReportFY2024.pdf (reflecting a total of 20 removals to Cambodia in 2024, 6 in 2023, 5 in 2022, and 1 in 2021). DHS represented to another federal court that it effectuated 55 removals to Cambodia in 2025, *Suong*, 2025 WL 3718644, at \*4. While the number of removals in 2025 is higher than in years past, it remains a tiny portion of the number of Cambodians with final, unexecuted removal orders. *See Chhoeun v. Marin*, No. 17-1898-CJC (GJSx), 2018 WL 6265014, at \*1 (C.D. Cal. Aug. 18, 2018) (noting that there were 1,900 Cambodians in the United States subject to final removal orders in 2018). Petitioner points to statistics from nongovernmental sources indicating that there were only a handful of removal flights to Cambodia during the current administration (Traverse at 7 (citing Human Rights First ICE Flight Monitor)) but the reality is that the Court does not need to credit that evidence to adjudicate the Petition: Respondents bear the burden of showing a likelihood of removal in the reasonably foreseeable future, and their vague assertions are inadequate considering ICE's difficulties in removing Petitioner specifically and, according to ICE's own statistics, Cambodians generally.

In short, Respondents have not met their burden of showing that, based on changed circumstances, Petitioner's removal is substantially likely to occur in the reasonably foreseeable future.

2.     **Petitioner's "Noncompliance" Is a Red Herring**

Respondents argue that Petitioner's "noncompliance" is a separate basis to detain him. (Answer at 4-5.) But Petitioner's alleged noncompliance could not possibly have been a basis for revoking his OSUP, because it did not occur until

after Petitioner was detained. Indeed, the Notice of Revocation has a space for DHS to allege violations of supervision (ECF 9-5 at 5), and cooperation is a condition of Petitioner's supervision (ECF 1-3 at 5), but the Notice says nothing about supervision being revoked for noncompliance. Respondents do not allege any act of noncompliance that predates revocation of the OSUP, only one that occurred once Petitioner was already detained. (*See* Mendoza Decl. ¶ 17.) As such, noncompliance does not provide an alternative basis to justify the revocation of Petitioner's OSUP.

The Court notes two further facts. First, a regulation provides specific instructions that DHS must take upon finding noncompliance: it must serve the noncitizen with a "Notice of Failure to Comply," advising him of the circumstances demonstrating his failure to comply with the requirements of section 241(a)(1)(C) and precisely what steps he must take to be in compliance with the statutory requirements. 8 C.F.R. § 241.4(g)(5)(ii). That notice is crucial, because it permits the noncitizen to understand what he must do to avoid the severe consequences that attend noncompliance and correct his conduct. The Court has no evidence before it that Respondents took that step here.

Second, Petitioner represents that after the Answer was filed, Petitioner met again with DHS and provided all the information he had to give—which Petitioner acknowledges is not a lot, given that he fled Cambodia as a ten-year-old child and spent most of his childhood in refugee camps. (Traverse at 3.)

In short, any noncompliance that may have occurred does not alter the Court's conclusion on Petitioner' OSUP revocation claim.

**3.    The Appropriate Relief Is Release**

Given the Respondents' inability to procure travel documents for Petitioner during the three year period ending in 1999, and their failure to provide any concrete reason to think they are much closer to obtaining Petitioner's travel documents now, the Court cannot conclude that Respondents

10

have met their burden to show that a likelihood of removal in the reasonably foreseeable future under 8 C.F.R. § 241.13(i)(2). As in *Zadvydas*, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." 533 U.S. at 699. The Court therefore concludes Petitioner is entitled to habeas relief and recommends that the Petition be granted as to Petitioner's OSUP revocation claim (Pet. ¶ 58-59).

**4.     Petitioner's Remaining Claims Does Not Support Greater Or Different Relief.**

Petitioner has not shown that he would be entitled to greater or different relief on his substantive or procedural due process claims (Pet. ¶ 60-80); those claims will therefore be denied moot in light of the relief recommended on the OSUP revocation claim.

Petitioner seeks injunctive relief that would limit Respondents' future ability to remove him to a third country. (Pet. ¶¶ 81-83.) The premise of the Petition, however, is that Respondents have not made any firm plans to remove him to a third country. (Pet. ¶ 32.) Respondents have likewise given the Court no reason to think they intend to remove Petitioner to a third country. Based on the record now before the Court, Petitioner has not shown a real and immediate threat of future injury under the challenged policy. He is therefore not entitled to injunctive relief. *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983). Petitioner's third-country claim is therefore denied without prejudice.

**CONCLUSION**

Accordingly, Petitioner's OSUP revocation claim is granted. Petitioner is ordered released on the OSUP conditions previously imposed within 24 hours of this Order. The remaining claims are denied without prejudice. Petitioner's counsel is ordered to file a status report confirming Petitioner's release within three days of his release from custody; if release is delayed for any reason, Petitioner shall promptly notify the Court. Upon receipt of confirmation that Petitioner has been released, judgment will issue and the Court will close the case.

DATED:  May 14, 2026

_____
BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE

12